1

2

3

4

5                UNITED STATES DISTRICT COURT

6                EASTERN DISTRICT OF WASHINGTON

7   DUSTIN CANFIELD and DARRIK
    GREGG,                                    NO. 2:24-CV-0098-TOR

8                        Plaintiffs,          ORDER ON DEFENDANTS'
                                              MOTION FOR SUMMARY
9        v.                                   JUDGMENT

10
    GRANT COUNTY SHERIFF'S
11  OFFICE, a Division of Grant County;
    and GRANT COUNTY, a legal
12  organized county existing under the
    laws of the State of Washington;
13  TOM JONES, individually; and
    RYAN RECTENWALD,
14  individually,

15                       Defendants.

16        BEFORE THE COURT are Defendants' Motion for Summary Judgment

17  (ECF No. 37) and Plaintiffs' Motion to Supplement Authorities (ECF No. 50).

18  These matters were submitted for consideration without oral argument.  The Court

19  has reviewed the record and files herein and is fully informed.  For the reasons

20  discussed below, Defendants' Motion for Summary Judgment (ECF No. 37) is

**GRANTED in part** and Plaintiffs' Motion to Supplement Authorities (ECF No. 50) is **GRANTED in part**.

## BACKGROUND

This case arises out of claims including wrongful discharge in violation of Washington public policy, intentional infliction of emotional distress ("IIED"), and First Amendment violations under 42 U.S.C. § 1983.  ECF Nos. 1-22 at 24-29.  On November 10, 2025, Defendants moved for Summary Judgment.  ECF No. 37.  On December 5, 2025, Plaintiffs filed a Motion to Supplement Authorities.  ECF No. 50.

Plaintiffs' claims arise out of allegations from their prior employment as Chief Deputies in the Grant County Sheriff's Office.  ECF Nos. 38 at 1; 47 at 2-3.  The claims involve allegations of Chief Deputy Ken Jones committing fraud by incorrectly taking leave time.  ECF Nos. 48 at 4; 52 at 7-8.

In addition to working at Grant County Sheriff's Office, the Sheriff, Tom Jones and Chief Deputy Ken Jones both were working for Seattle's Finest.  ECF No. 46 at 2.  Plaintiff Dustin Canfield brought to the Sheriff, Tom Jones, concerns about Chief Deputy Ken Jones's potential illegal leave use from his work at Seattle's Finest resulting in tax fraud claims.  ECF Nos. 48 at 4; 52 at 7-8.  Plaintiff Dustin Canfield asked to meet with the Sheriff, Tom Jones, at Grant County Park to tell him that he was informed by "some non-exempt commissioner officers" that

Chief Deputy Ken Jones's leave use and income were inconsistent.  ECF Nos. 38 at 2; 48 at 3-4.

After it was brought to the Sheriff's attention, he reviewed available information but concluded that it did not require further action.  ECF No. 52 at 9. The Sheriff told Canfield the same thing.  *Id.*  On May 18, 2021, Defendant Undersheriff Rectenwald spoke with Canfield to address the issue that Canfield did not follow the chain of command when he failed to come to him with this issue. ECF No. 52 at 11.

On August 11, 2021, a meeting was held at Tracy Williams' house.  ECF No. 52 at 19- 21.  At this meeting, the issue regarding the complaint was addressed.  *Id.*  Plaintiffs, Canfield and Gregg, allege that it was "uncomfortable" and "Canfield was made to tell everybody why he was there."  ECF No. 52 at 20. Allegedly, the Sheriff did not believe Canfield wished to have his name as confidential, however, Canfield's father states he asked to keep it confidential. ECF No. 52 at 22-23.

Employees recall the office environment changing, including closed-door meetings, tension and "silos" within the office.  ECF No. 52 at 12.  Plaintiffs allege closed door meetings and meetings about the alleged illegal acts where employees were asked to not speak on the matter.  ECF Nos. 43 at 18; 43-5 at 7; 52 at 26, 19-20.  Plaintiff Gregg received instructions from Rectenwald to not talk about outside

employment.  ECF No. 52 at 14.

On September 20, 2021, Plaintiff Canfield resigned.  ECF No. 52 at 28.  The Sheriff brought this concern of Canfield's resignation to Gregg, inquiring about why this was not brought to his attention.  ECF No. 41-2 at 111-112.  On October 18, 2021, Plaintiff Gregg resigned.  ECF No. 52 at 32.  Additional relevant facts will be provided in the analysis.

## DISCUSSION

## MOTION TO SUPPLEMENT AUTHORITIES

On December 5, 2025, Plaintiffs filed a Motion to Supplement Authorities. ECF No. 50.  These authorities include citations to cases about suppressed silence and suppressed speech.  ECF No. 50 at 3.  Plaintiffs' brief continues that Defendants did not effectively raise arguments against their suppressed silence claim.  ECF No. 50 at 2.  Defendants agreed to stipulate to the authorities but not to the contextual paragraph arguing that they did not raise this issue.  ECF No. 54. Defendants continue that they did not follow the local rules and do not meet the standard to allow for the supplementation of authorities and arguments after their response.  ECF No. 54.

In Plaintiffs' reply, they argue that they argue a compelled speech claim that was not addressed in Defendants' Motion for Summary Judgment.  ECF No. 60 at 2.  Defendants disagree on this argument, and Plaintiffs filed this motion in

response because they could not agree to complete stipulation. *Id.* Plaintiffs allege the portion was accidentally deleted before submission. ECF Nos. 50 at 2; 54-1 at 5.

In the interest of justice and because the parties agreed previously to stipulate to this section, the Court will allow the supplemental authorities but not the additional paragraph under the "Need for Supplementation" section. This section provides arguments rather than authorities on the relevant issues. *See Gausvik v. Perez*, 239 F. Supp. 2d 1108, 1112 (E.D. Wash. 2002) (disregarding new arguments not filed with the original response); *Doe v. Colville Sch. Dist. No. 115*, 2012 WL 554430, at *3 (E.D. Wash. Feb. 21, 2012) (Defendants stated a valid reason for denying a supplemental affidavit and Plaintiffs did not provide a legitimate excuse for the late submission). While Plaintiffs did provide an excuse, Defendants established a fair reason to deny this because there are new arguments from their original reply. ECF No. 54. Therefore, the Court grants this motion in part.

## MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure Rule 56, governing summary judgment, provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A material fact is one that "might affect

the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A material fact is 'genuine'…if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden initially rests with the moving party; however, once that burden is met, it shifts to the non-moving party. *Id.* at 257.

"[S]ummary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party.'" *Anderson*, 477 U.S. 242, 251 (1986) (quoting *Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624 (1944)). Additionally, if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" then the moving party is "entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56).

The Court "must view the evidence in the light most favorable to the nonmoving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, if the moving party provides direct evidence that conflicts with the non-moving party's direct evidence, the court "must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv., Inc.*, 809 F.2d at 631. A "district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence [,]" however, a "district court may not disregard a

1    piece of evidence at the summary judgment stage solely based on its self-serving

2    nature." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015)

3    (citation omitted).  Additionally, the Court shall state the reasons for granting or

4    denying the motion on the record.  FED. R. CIV. P. 56.

5        On November 10, 2025, Defendants filed a Motion for Summary judgment.

6    ECF No. 37.  Defendants request the Court to grant the motion and to dismiss

7    Plaintiffs' claims in their entirety.  ECF No. 37 at 18.

8        **FIRST AMENDMENT VIOLATION UNDER 42 U.S.C § 1983**

9        Defendants argue that they did not violate Plaintiffs' First Amendment right,

10   and therefore, qualified immunity applies and bars this claim.  ECF No. 37 at 8-9.

11   Defendants argue that qualified immunity precludes Plaintiffs claim under 42

12   U.S.C. § 1983 for First Amendment retaliation against Jones and Rectenwald.

13   ECF No. 37 at 8.  Nevertheless, Defendants contend no First Amendment violation

14   occurred.  *Id.*  Defendants support this by stating that Plaintiffs spoke as public

15   employees, they did not suffer adverse employment action, nor were any alleged

16   adverse actions motivated by protected activity conducted by the Plaintiffs.  ECF

17   No. 37 at 11-14.  Defendants continue that the law was not clearly established for

18   every reasonable official to know that the conduct was unconstitutional.  ECF No.

19   37 at 14-15.  Therefore, Defendants argue that Plaintiff's claims should be

20   dismissed.  ECF No. 37 at 18.

1    For a plaintiff to bring a § 1983 claim against a municipality or an individual

2    officer, a constitutional or federal right must be violated. *Horton by Horton v. City*

3    *of Santa Maria*, 915 F.3d 592, 602–03, 599 (9th Cir. 2019).

4    "To establish a prima facie First Amendment retaliation claim, the plaintiff

5    must prove that '(1) [ ]he engaged in protected speech; (2) the defendants took an

6    adverse employment action against h[im]; and (3) h[is] speech was a substantial or

7    motivating factor for the adverse employment action.'" *Dodge v. Evergreen Sch.*

8    *Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) (quoting *Howard v. City of Coos Bay*,

9    871 F.3d 1032, 1044 (9th Cir. 2017)). During the pleading state, the complaint

10   must allege "plausible circumstances connecting the defendant's retaliatory intent

11   to the suppressive conduct." *Jensen v. Brown*, 131 F.4th 677, 690 (9th Cir. 2025)

12   (quoting *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir.

13   2016)). Once these elements are established, then the burden of evidence and

14   persuasion shifts to the defendant. *Id.* The defendant is required to provide

15   evidence "show that the balance of interests justified their adverse employment

16   decision." *Dodge*, 56 F.4th at 776 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1074

17   (9th Cir. 2009)). In other words, if a defendant shows there is a legitimate

18   administrative reason or interest in the suppression of speech that outweighs the

19   plaintiff's First Amendment protection, then there is not a prima facie case for

20

retaliation.  *Dodge*, 56 F.4th at 776–77 (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)).

**A. Protected Speech**

To determine whether a public employee has engaged in protected speech is dependent on two questions: "(1) whether he 'spoke on a matter of public concern,' and (2) whether he 'spoke as a private citizen or public employee.'" *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (quoting *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011)).

Speech on a public matter is broadly defined.  *Dodge*, 56 F.4th at 777 (citation omitted).  If it could be determined as a matter associating with "'political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest'" then it could be determined as speech of a public issue. *Dodge*, 56 F.4th at 777 (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)).  When deciding whether speech is on a public matter, the Court considers the "content, form, and context of a given statement, as revealed by the whole record."  *Dodge*, 56 F.4th at 777 (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995)).  None of these factors are dispositive, however, content is the main factor to consider.  *Dodge*, 56 F.4th at 777.

First, plaintiffs must allege facts that support a First Amendment violation, which requires facts that they engaged in protected speech.  Defendants do not

argue that Plaintiffs did not speak on a public matter but rather that Plaintiffs spoke as public employees not as private citizens.  ECF No. 37 at 10.

Second, Plaintiffs must allege facts that support they spoke as private citizens rather than as public employees.  An individual is speaking as a public employee when they are speaking on matters regarding their official duties.  *Jensen v. Brown*, 131 F.4th 677, 688 (9th Cir. 2025) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  Under *Dahlia*, the Court considered: (1) if the "employee confined his communications to his chain of command" (2) "the subject matter of the communication" and (3) whether the public employee spoke "in direct contravention of his supervisor's orders."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013).  However, when there are genuine and material disputes regarding Plaintiffs' job duties, scope, or content, then this a question of fact, and the court must reserve judgment until after fact-finding.  *Robinson v. York*, 566 F.3d 817, 823–24 (9th Cir. 2009) (citation omitted).

Plaintiffs state that under *Dahlia*, Plaintiffs did report their concerns to people outside of the workplace.  ECF No. 49 at 9; *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013).  Furthermore, they use *Dahlia* to support that speech regarding "corruption or systematic abuse" is not likely to be considered within the job duties.  *Id.*; *Dahlia*, 735 F.3d at 1075.  Plaintiffs state that they both "spoke about taxpayer fraud in the Grant County Sherrif's Office, and insistence on fraud

1    being properly investigated." ECF No. 49 at 7.  As a reminder, the Court will only

2    consider facts not alleged legal conclusions. *See Nigro v. Sears, Roebuck & Co.*,

3    784 F.3d 495, 497 (9th Cir. 2015).

4        *I. Canfield*

5        Considering the first factor under *Dahlia*, Canfield spoke to the Sheriff who

6    was above but still in his chain of command.  ECF No. 52 at 3-4; *Dahlia v.*

7    *Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013).  However, Canfield also spoke to

8    his father, Garth Dano, the Prosecuting Attorney for Grant County, Chief Deputy

9    Joe Kriete, and Tracy Williams, lead administrative assistant for the Grant County

10   Sheriff's Office.  ECF No. 52 at 7.  Speaking on the matter with people outside his

11   chain of command and his workplace supports that he was speaking as a citizen.

12   *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) ("If however a public

13   employee takes his job concerns to persons outside the work place in addition to

14   raising them up the chain of command at his workplace, then those external

15   communications are ordinarily not made as an employee, but as a citizen.")

16   (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)).  In support of the

17   third factor, speaking with others regarding this matter also evidenced that

18   Canfield went against superior's requests to not speak further on the issue.

19       Additionally, Canfield spoke about alleged illegal conduct within the

20   Sheriff's office which falls in line with corruption and systematic abuse.  *Dahlia v.*

1  *Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) ("[I]f a public employee raises

2  within the department broad concerns about corruption or systemic abuse, it is

3  unlikely that such complaints can reasonably be classified as being within the job

4  duties of an average public employee, except when the employee's regular job

5  duties involve investigating such conduct.").

6      Lastly, Undersheriff Rectenwald met with Canfield to discuss his failure to

7  follow the chain of command and come to him with the issue.  ECF No. 52 at 11.

8  Additionally, at the August 11 meeting, Canfield was put on the spot and asked to

9  explain why everyone was there.  ECF No. 52 at 19-22; *Dahlia v. Rodriguez*, 735

10 F.3d 1060, 1075 (9th Cir. 2013) ("the fact that an employee is threatened or

11 harassed by his superiors for engaging in a particular type of speech provides

12 strong evidence that the act of speech was not, as a 'practical' matter, within the

13 employee's job duties") (citation omitted).  While these incidents may not rise to

14 the level of harassment or threats, the sensitive subject matter that Canfield had to

15 speak on against his fellow co-worker in front of his co-workers is at least

16 inappropriate.  For these reasons, Plaintiffs allege disputed material facts that

17 support Canfield's communication was as a private citizen and therefore protected

18 speech.

19      Defendants claim that Plaintiffs did not properly allege that Plaintiff

20 Canfield's father was threatened as a retaliatory conduct in Canfield's deposition.

ECF No. 51 at 1-2.  However, in Plaintiff's First Amended Complaint, it states that the retaliation it references this allegation.  ECF No. 1-22 at 27.  Furthermore, it is described in Canfield and his father's declarations with the letter attached.  ECF Nos. 45 at 7-9; 42 at 33; 42-8 at 2-8.  While Plaintiffs did not allege this letter to a specific question in his deposition, it is in other forms.  Regardless of whether Canfield's father's letter should be addressed, there are enough other facts to support that Canfield was speaking as a private citizen.

*2. Gregg*

Gregg spoke within his chain of command to others in the workplace.  ECF No. 43 at 11, 13-14.  Gregg inquired whether an internal investigation was going to occur to his superiors.  *Id.*  Gregg alleged to speak to other co-workers including Canfield and Joe Kriete.  ECF No. 43 at 13.

The subject matter was regarding procedures within the workplace.  *Jensen v. Brown*, 131 F.4th 677, 688 (9th Cir. 2025) (stating that an individual is speaking as a public employee when they are speaking on matters regarding their official duties) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  The difference between Gregg and Canfield is that Canfield brought the allegation and concern of corruption about another employee to the Sheriff in an outside work meeting and environment.  Additionally, Canfield spoke to many others in and outside the workplace.  However, Gregg inquired about the status of an internal investigation

1  to his superiors and co-workers.  He was not, for the alleged first time, bringing

2  these allegations to others.  While this investigation regarded possible illegal

3  matters, it was about concerns within his workplace.

4      Gregg alleged that he was in multiple meetings about the issue and was

5  requested to stop speaking on the matter.  ECF Nos. 43 at 18; 43-5 at 7. Gregg

6  states on October 4, 2021, with the Sheriff, Undersheriff Rectenwald, Chief

7  Deputy Ken Jones and Chief Deputy Joe Kriete and Tracy Williams.  ECF No. 43

8  at 17-18.  He states that the Sheriff brought up the allegation and that he

9  investigated and did not want anyone to talk about it.  ECF No. 43 at 18; 52 at 19-

10  20.  Gregg states the Sheriff stated how he was "butting heads" with Ken Jones.

11  *Id.*  Gregg furthers that the Sheriff told the group, "I appointed you to your

12  positions, and if you don't want to be in your place, just raise your hand and I will

13  get you replaced."  ECF No. 43 at 18.  Gregg was asked why he did not bring up

14  Canfield's resignation and whether he trusted them.  ECF No. 52 at 26; 43 at 15-

15  16.  Additionally, Gregg received upset or angry communication regarding his own

16  resignation, however, this is not directly in response to his speech.  ECF No. 43 at

17  21; 52 at 26.  These meetings and statements do not rise to the level of harassment

18  and threats.  Furthermore, while Gregg spoke to a couple of others, it is unclear

19  whether he contravened his superior's orders and continued to speak on it to

20

others.  These facts, in favor of the non-moving party, do not show a genuine

dispute of fact that Plaintiff Gregg was speaking as private citizen.

Plaintiffs allege that the August 11th meeting supports that Gregg and

Canfield spoke as private citizens, however, this was not proposed or formed by

Gregg or Canfield.  ECF No. 49 at 7-9.  Canfield was asked to speak but this does

not show him "bringing claims" outside the chain but rather this action was set

forth by the Sheriff.  Additionally, Plaintiffs do not allege that Gregg spoke during

the meeting.  Therefore, this argument fails, and Plaintiffs did not allege facts that

Gregg spoke as a private citizen.

a.  Compelled Speech/Silence

Plaintiffs supplemented authorities regarding compelled silence and speech.

ECF No. 50.  Plaintiffs allege compelled silence and speech in their Complaint,

which violates the First Amendment.  ECF No. 1-22.  Defendants did not directly

argue that Plaintiffs did not make a compelled speech claim.  However, they claim

that Plaintiffs did not argue a First Amendment violation.  ECF No. 37 at 8-11.

Nevertheless, the elements they dispute constitute a First Amendment retaliation

claim.  *Id.*

Under the First Amendment, "the government may not compel a person to

speak its own preferred messages.  *303 Creative LLC v. Elenis*, 600 U.S. 570, 586

(2023).  Compelled speech and silence are not distinctive.  *Riley v. Nat'l Fed'n of*

*the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988). Typically, we see these claims about government policies or statutes. *See 303 Creative* LLC, 600 U.S. at 586. That element of penalization for failure to adhere to the policy or statute is typically a part of the claim. However, Plaintiffs did not allege there was a statute or policy within the municipality that requires this alleged compelled speech of silence. Similarly, as will be discussed, the municipality cannot be liable for Defendants Rectenwald's and Jones's conduct unless it meets the requirements under *Monell*. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

Plaintiffs did not allege facts that specific speech or silence was a requirement. Plaintiffs allege Defendants Rectenwald and Jones asked for silence. ECF No. 52 at 19-22. However, Plaintiffs did not allege facts that Plaintiffs were forced or compelled to speak or stay silent or compelled. In other words, there was not a predisposed penalty or punishment for speaking or staying silent. For example, Canfield was asked to speak on the matter at the August 11th meeting but did not allege facts that he was required to speak for a specific viewpoint or message. *See generally 303 Creative LLC v. Elenis*; ECF Nos. 41-1 at 116-17; 52 at 19-22. He did not receive punishment for his speech content at that meeting. However, he was asked not to speak on the matter and "quash rumors." *Id.* He did not receive a predisposed punishment for this beyond an alleged shift in work

environment and alleged legal violations such as constructive termination. However, it is unclear how constructive termination could be considered a punishment or penalty that would compel speech because of its indirect nature.

For similar reasons, Plaintiffs did not allege facts to support Gregg's allegation of compelled speech or silence. Gregg was asked not to speak on the matter but does not allege facts that he was compelled not to speak, as he inquired about the investigation. Additionally, he did not receive a penalty or punishment as a result. He was in meeting about speaking about it and was told that he could be replaced, but that did not result in a termination because Plaintiff Gregg resigned. ECF No. 43 at 18. For the same reasons, constructive discharge is insufficient. Even more, this claim would not survive under qualified immunity because Plaintiffs did not allege how this law or right was established at the time of the conduct.

Defendants argue that Plaintiff's complaint references state protections, when federal protections are required under a § 1983 claim. ECF No. 37 at 9. However, as established, Plaintiffs provided sufficient evidence of a First Amendment violation and referenced First Amendment protections in their complaint and in their response. ECF No. 1-22 at 24-30.

**B. Adverse Employment Action**

Next, Plaintiffs must show that an adverse employment action resulted. "To

1    constitute an adverse employment action, a government act of retaliation need not

2    be severe and it need not be of a certain kind." *Jensen v. Brown*, 131 F.4th 677,

3    689 (9th Cir. 2025) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th

4    Cir. 2003)).  Minor acts of retaliation can support a claim for a violation of the

5    First Amendment.  *Jensen*, 131 F.4th at 689 (citation omitted).  In other words, the

6    court considers whether the actions would "reasonably likely to deter" employees

7    from "engaging in speech protected under the First Amendment." *Jensen*, 131

8    F.4th at 689 (quoting *Coszalter*, 320 F.3d at 976-77).  Importantly, "[t]he goal is to

9    prevent, or redress, actions by a government employer that 'chill the exercise of

10   protected' First Amendment rights."  *Coszalter v. City of Salem*, 320 F.3d 968,

11   974–75 (9th Cir. 2003) (quoting *Rutan v. Republican Party,* 497 U.S. 62, 73

12   (1990)).

13       Plaintiffs argue that both were "reprimanded, placed in hostile situations,

14   ordered to stop talking, ordered to band with Defendants and protect a Chief

15   Deputy believed to be engaged in timecard fraud."  ECF No. 49 at 13.

16       The August 11th meeting would reasonably deter Canfield from engaging in

17   protected speech.  ECF No. 52 at 19-20.  While the Sheriff alleges his intent was

18   open discussions, Canfield was discovered as the worker who brought the issue to

19   light and was asked to speak on it in front of his coworkers and superiors.  ECF

20   No. 52 at 19-21.  For example, in *Allen v. Scribner*, 812 F.2d 426, 428 (1987), the

plaintiff was reassigned to a different position and "harassed in retaliation" of his speech to the press and this constituted an adverse employment action. Additionally, Canfield states he was removed from supervising other people and was not included in closed-door meetings. ECF No. 41-1 at 120. Therefore, these facts are sufficient to show a genuine dispute in material fact about whether these actions constitute adverse employment actions.

Even though Gregg did not allege a genuine dispute of material facts that he spoke as a public citizen, Plaintiff Gregg does not provide sufficient facts for adverse employment action. He states his job was threatened but the alleged threat states that he was told he could be replaced if he did not want to be there. ECF No. 43 at 18. This does not pose an adverse employment action. At best, Gregg alleges being excluded from meetings, but this does not rise to the level of an adverse employment action alone. Gregg did not receive a bad evaluation, received less pay, or was reassigned. Therefore, Plaintiff Gregg cannot meet the requirement to survive summary judgment.

## C. Causation of Adverse Employment Action

The Ninth Circuit provided three ways for a plaintiff to evidence that retaliation was a substantial or motivating factor of the alleged adverse employment actions: (1) the plaintiff can show that the closeness in time in which the protected occurred (2) the plaintiff can show that "his employer expressed

1    opposition to his speech, either to him or to others", (3) the plaintiff can show that

2    "his employer's proffered explanations for the adverse employment action were

3    false and pre-textual." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.

4    2003) (citing *Keyser v. Sacramento City Unified School District,* 265 F.3d 741 (9th

5    Cir. 2001)).  However, not much direct evidence is required to prove this element.

6    *Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025).

7         Similarly, the August 11th meeting and constant discussions on the topic of

8    the alleged fraud was after Plaintiff brought the concern to the Sheriff.  ECF No.

9    52 at 19-21.  Furthermore, these discussions were in response to that based on the

10   subject matter.  Additionally, from August 11th to the end of his employment after

11   his September resignation, Canfield states he was removed from meetings and

12   supervision of others after the concern was brought to the attention of the Sheriff.

13   ECF No. 41-1 at 120; *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003)

14   ("Depending on the circumstances, three to eight months is easily within a time

15   range that can support an inference of retaliation.").  This also shows that his

16   superiors were in opposition of speech.  Considering the evidence in favor of the

17   non-moving party, there is a genuine dispute of material fact and summary

18   judgment is improper.

19        **D. *Monell***

20        Under § 1983, municipalities may be liable "for constitutional injuries

1   pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to

2   train, supervise, or discipline; or (4) a decision or act by a final policymaker."

3   *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

4   This requires the plaintiff showing that there was "*deliberate* action attributable to

5   the municipality [that] directly caused a deprivation of federal rights." *Horton*, 915

6   F.3d at 603 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997)).

7   However, they are not liable under *respondeat superior*. *Id.* at 603. Specifically,

8   "a local government may not be sued under § 1983 for an injury inflicted solely by

9   its employees or agents. *Monell v. Dep't of Soc. Servs. of City of New York*, 436

10  U.S. 658, 694 (1978).

11      *Monell* requires that a Plaintiff shows: "(1) he or she had a constitutional

12  right of which he was deprived; (2) the municipality had a policy; (3) the policy

13  amounts to deliberate indifference to his constitutional right; and (4) 'the policy is

14  the moving force behind the constitutional violation.'" *Est. of Nelson by &*

15  *through Nelson v. Chelan Cnty.*, 2024 WL 1705923, at *15 (E.D. Wash. Apr. 19,

16  2024) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

17      Defendants claim that Plaintiffs' claims cannot survive under *Monell*.

18  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); ECF No.

19  37 at 15. Plaintiffs state they meet the elements required under *Monell* based on

20  other parts of their brief. ECF No. 49 at 16. Plaintiffs contend that the First

1    Amendment violation led to threats and intimidation, "that Grant County had

2    policies intended to protect whistleblowers and prohibit nepotism" but did not

3    enforce them with the Sheriff and Defendants failure to protect whistleblowers and

4    the suppression of speech, led to "deliberate indifference to Plaintiffs' First

5    Amendment rights" and that failure to enforce policies to protect was the "force

6    behind the constitutional violation." ECF No. 49 at 16-17.

7         As discussed, the constitutional right is the right under the First Amendment.

8    The policies in question include the whistleblowers protection and to "prohibit

9    nepotism." ECF No. 49 at 16-17. Defendants state these are Grant County's

10    policies not the Sheriff's office. ECF No. 54.

11         Plaintiffs did not directly cite whistleblower protection or the nepotism

12    prohibition but are alleged in ECF Nos. 41-1 at 10; 42-10 at 4. However, Plaintiffs

13    did not cite facts about how the municipality failed beyond the officer's actions for

14    failure to implement specific policies. Specifically, Plaintiffs did not allege a

15    deliberate action by the municipality, or even that this policy led to the indifference

16    of Canfield's First Amendment right other than alleging legal conclusions. ECF

17    No. 49 at 16-17. Importantly, "municipal liability could not be premised on the

18    mere fact that the municipality employed the offending official." *City of*

19    *Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985). As a result, Plaintiffs did not

20

1  allege a genuine dispute of material fact for a § 1983 claim against the

2  municipality.  Summary judgment is proper.

3  **E. Qualified Immunity**

4  Defendants contend that qualified immunity applies, and therefore the claim

5  does not hold.  ECF No. 37 at 8-9.  However, as was discussed, Plaintiffs allege

6  facts to support a First Amendment violation.  Plaintiffs respond that all the

7  elements are met, and qualified immunity does not preclude Plaintiffs claims

8  because there was a constitutional violation.  ECF No. 49 at 5.

9  If a plaintiff brings § 1983 claims against an individual officer, it must

10  exhibit two things.  "(1) a federal right has been violated and (2) the right was

11  clearly established at the time of the violation."  *Horton*, 915 F.3d at 599 (quoting

12  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  To allege that a law or right was

13  clearly established, it must "at the time of the officer's conduct, the law was

14  sufficiently clear that every reasonable official would understand that what he is

15  doing is unlawful.  *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021)

16  (citing *D.C. v. Wesby*, 583 U.S. 48, 63 (2008)).  "While there does not have to be a

17  case directly on point, existing precedent must place the lawfulness of the

18  [conduct] beyond debate."  *Villanueva,* 986 F.3d at 1165 (citing *D.C. v. Wesby*, 583

19  U.S. 48, 63 (2018)) (internal quotations omitted).

20

Plaintiffs cite *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Cuevas v. City of Tulare*, 107 F.4th 894, 898, (9th Cir. 2024).  ECF No. 49 at 17.  Plaintiffs alleges that their brief addressed these requirements, however, the Court would like more explanation and citations to argue against this argument rather than referencing previous arguments.  Defendants replies that Plaintiffs must cite case law to support that the specific conduct clearly would constitute illegal action.  ECF No. 51 at 10.

Plaintiffs' cited cases are not relevant to the facts beyond the rules.  Plaintiff cited cases regarding officers in fourth amendment violations. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Cuevas v. City of Tulare*, 107 F.4th 894, 898, (9th Cir. 2024).  Regardless, the Court must determine whether Plaintiffs provided a dispute of material facts regarding whether this was right was sufficient clear.  These allegations occurred in 2021; therefore, precedent must be at the time of the alleged conduct.

Plaintiff uses *Dahilia* and *Garcetti* to support the fact that Plaintiffs speech was protected.  ECF No. 49 5-9.  These cases were published in 2013 and 2006 respectively.  As discussed, these cases analyze what is considered protected speech in a similar context and for First Amendment retaliation.  Therefore, while the case is not on point, it does not need to be.  Additionally, Plaintiffs cite to cases where bringing up alleged illegalities within the government is was considered

protected speech.  ECF No. 49 at 6 (citing *Connick v. Myers*, 461 U.S, 138, 148

(1983)).  This case was established well before 2021.  Plaintiffs provided relevant

case law and therefore, summary judgment is improper.

## WRONGFUL DISCHARGE IN VIOLATION OF WASHINGTON

## PUBLIC POLICY

Generally, Washington employees are considered "at will" and may be

terminated or quit at any time for any reason.  *Martin v. Gonzaga Univ.*, 191 Wash.

2d 712, 722–23 (2018).  A wrongful discharge claim is a common law "narrow

exception to the terminable-at-will doctrine."  *Danny v. Laidlaw Transit Servs.,*

*Inc.*, 165 Wash. 2d 200, 207 (2008) (citation omitted).  A wrongful discharge claim

is recognized in four scenarios:

> (1)where employees are fired for refusing to commit an illegal act;
> (2) where employees are fired for performing a public duty or
> obligation, such as serving jury duty; (3) where employees are fired
> for exercising a legal right or privilege, such as filing workers'
> compensation claims; and (4) where employees are fired in
> retaliation for reporting employer misconduct, i.e., whistleblowing.

*Rose v. Anderson Hay & Grain Co.*, 184 Wash. 2d 268, 276 (2015) (quoting

*Gardner v. Loomis Armored Inc.*, 128 Wash. 2d 931, 936 (1996)); *Martin*, 191

Wash. 2d at 723.

In addition to establishing whether a claim falls within one of the four

scenarios, the plaintiff is required to "identify the recognized public policy and

demonstrate that the employer contravened that policy by terminating the employee." *Rose*, 184 Wash. 2d at 276.  This is a two-step process.  *Suarez v. State*, 3 Wash. 3d 404, 430 (2024).  First, the policy must be "manifested in the constitution, statute, regulatory provision, or court decision." *Id.*  Second, the conduct at issue with the public policy must be "a 'significant factor' in the decision to terminate the worker." *Id*.  Once that burden is met then the employer must prove the dismissal was for reasons other than reasons that the employee alleged.  *Martin*, 191 Wash. 2d at 723 (citations omitted).

Furthermore, under Washington Law, wrongful discharge is either constructive or express, however, this type of discharge does not become a separate cause of action.  *Snyder v. Med. Serv. Corp. of E. Washington*, 145 Wash. 2d 233, 238 (2001).  "[C]onstructive discharge occurs '[w]here an employer *deliberately* makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bulaich v. AT & T Info. Sys.*, 113 Wash. 2d 254, 261 (1989) (quoting *Barrett v. Weyerhaeuser Co. Severance Pay Plan,* 40 Wash. App. 630, 631 (1985)) (internal quotations omitted).  The presumption is that when an employee resigns it is voluntary, but an employee can rebut this presumption with facts evidencing the resignation was either "prompted by duress or an employer's oppressive actions." *Townsend v. Walla Walla Sch. Dist.*, 147 Wash. App. 620, 627 (2008) (citation omitted).

1    On that note, courts typically review constructive discharge elements and

2    wrongful termination elements separately.  *Peiffer v. Pro-Cut Concrete Cutting &*

3    *Breaking Inc*., 6 Wash. App. 2d 803, 829 (2018).  Elements of constructive

4    discharge are:

5        (1) the employer deliberately made working conditions intolerable, (2)
         a reasonable person in the employee's position would be forced to
6        resign, (3) the employee resigned because of the intolerable condition
         and not for any other reason, and (4) the employee suffered damages as
7        a result of being forced to resign.

8    *Peiffer,* 6 Wash. App. 2d at 829 (2018). "The question of whether the

9    working conditions were intolerable is one for the trier of fact, unless there is no

10   competent evidence to establish a claim of constructive discharge." *Haubry v.*

11   *Snow*, 106 Wash. App. 666, 677 (2001).  Intolerable work conditions may be

12   shown "by demonstrating aggravating circumstances or a continuous pattern of

13   discriminatory treatment." *Allstot v. Edwards*, 116 Wash. App. 424, 433 (2003)

14   (citation omitted).  "This is an objective standard and an 'employee's subjective

15   belief that he had no choice but to resign is irrelevant.'" *Barnett v. Sequim Valley*

16   *Ranch, LLC*, 174 Wash. App. 475, 485 (2013) (quoting *Travis v. Tacoma Pub. Sch.*

17   *Dist.,* 120 Wash. App. 542, 551 (2004)).

18   Defendants argue that because Plaintiffs resigned from their positions, they

19   must prove constructive discharge.  ECF No. 37 at 17.  Defendants continue that

20   Plaintiffs have not provided or identified sufficient evidence to support a finding of

1    "intolerable conditions." *Id.*  Therefore, this claim should be dismissed.  Plaintiffs

2    argue that they were constructively discharged from their positions because the

3    Sheriff gave orders to Plaintiffs such as to not speak on the matter, speak falsely,

4    and show loyalty.  ECF No. 49 at 19.

5        Plaintiffs provide facts to support the contention that there is a question of

6    whether the work conditions are intolerable.  Canfield states he was in a meeting

7    where this issue was brought up and Ken Jones "yelled and pounded fist on the

8    table."  ECF No. 42 at 21.  Additionally, Canfield's father received an

9    inappropriate letter from Ken Jones asking him not to speak on it.  ECF Nos. 45 at

10   7-8; 42 at 33; 42-8 at 2-8.  Canfield's supervision role was removed, and he was

11   not involved in meetings.  ECF No. 42 at 27.  Canfield was asked to speak up in

12   front of co-workers about a sensitive topic but then asked not to speak on the

13   allegations.  ECF No. 52 at 19-20.

14       Gregg states that there in late May and June of 2021, the office environment

15   "deteriorated" and there were many "closed door meetings" where he was

16   "excluded."  ECF No. 43 at 9.  Gregg alleges Rectenwald and the Sheriff

17   demanded that Gregg be loyal to them.  ECF No. 43 at 15.  Gregg furthers that the

18   Sheriff would "stay in his office and not interact with anyone" and "would not

19   look, talk and be around [Canfield] after giving his notice."  ECF No. 43 at 16.

20

Additionally, Gregg states that Ken Jones was often gone leaving Gregg with more assignments and work to "an overwhelming degree."  ECF No. 43 at 16.

Considering the reaction to Canfield bringing allegations, the subsequent August 11th meeting, and the facts provided, there is a question of fact regarding whether these facts constitute an intolerable condition.  Similarly for Gregg, the August 11th meeting, additional work, exclusion from meetings, and meetings asked not to speak on the issue creates a question of fact.  As the Washington Court of Appeals, Division One stated, "[w]hile it may be a difficult burden for [Plaintiffs] to prove that the conditions were 'intolerable' at trial", there is at least a question of fact.  *Haubry v. Snow*, 106 Wash. App. 666, 678 (2001).  Therefore, summary judgment is improper.

Defendants argue that a higher standard is required under *Burch v. City of Chubbuck*, 146 F.4th 822 (9th Cir. 2025).  ECF No. 37 at 11-14.

> Constructive discharge requires that working conditions deteriorate, as a result of [the adverse employment action(s)], to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

*Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025) (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quotations omitted).  As the Ninth Circuit stated, it is not easy to meet "because 'federal antidiscrimination

policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.'" *Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025) (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007)).  Regardless of the focus on discrimination, the higher standard still stands.

As discussed, there are other adverse actions that suffice to survive summary judgment for Canfield other than constructive discharge.  Nevertheless, Defendant is correct that under *Burch* Plaintiffs did not allege a genuine dispute of material facts to support the higher standard.  *Burch v. City of Chubbuck*, 146 F.4th 822, 838 (9th Cir. 2025).  For example, in *Burch*, duties being transferred and reduced decision-making duties did not meet the required standard.  *Id.*  Therefore, Plaintiff Canfield cannot use constructive discharge as an adverse employment action under his § 1983 claim.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The elements required for a claim of intentional infliction of emotional distress include: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual resulting severe emotional distress." *Pettis v. State*, 98 Wash. App. 553, 563 (1999) (citing *Rice v. Janovich,* 109 Wash. 2d 48, 61 (1987)).  "Although these elements are generally factual questions for the

jury, a trial court faced with a summary judgment motion must first determine whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Strong v. Terrell*, 147 Wash. App. 376, 385 (2008) (citing *Robel v. Roundup Corp.,* 148 Wash. 2d 35, 51 (2002)).

Defendants argue that Plaintiffs do not provide sufficient evidence to show extreme and outrageous conduct, intent, or actual severe distress. ECF No. 37 at 17. However, Plaintiffs argue that they did provide sufficient facts. ECF No. 49 at 20-21.

**A. Extreme and Outrageous Conduct**

To show extreme and outrageous conduct, the behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Pettis v. State*, 98 Wash. App. 553, 563 (1999) (quoting *Dicomes v. State,* 113 Wash. 2d 612, 630 (1989)) (internal quotations omitted). The required emotional distress must not be from embarrassment or humiliation. *Pettis v. State*, 98 Wash. App. 553, 563 (1999) (citing *Dicomes,* 113 Wash. 2d at 630). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not enough. *Snyder v. Med. Serv. Corp. of E. Wash*., 98 Wash. App. 315, 321–22 (1999), *aff'd sub nom. Snyder v. Med. Serv. Corp. of E. Washington*, 145 Wash. 2d 233 (2001) (quoting *Grimsby v. Samson,* 85 Wash. 2d

52, 59 (1975)).  Furthermore, people "must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Id.* at 322 (quoting *Grimsby,* 85 Wash. 2d at 59).   The outrageous standard is high and not easy to meet.  *Christian v. Tohmeh*, 191 Wash. App. 709, 736 (2015) (citations omitted).

Plaintiffs respond that the Sheriff's and Undersheriff's conduct against Plaintiffs for Plaintiffs goal to seek the truth was extreme and outrageous.  ECF No. 49 at 20.  Plaintiffs further that "denying Plaintiff Canfield whistleblower protection, suppressing Plaintiff's speech and association rights both on the job and within the community at large (quash rumors)" as support.  ECF No. 49 at 20.  However, these statements contain conclusory statements regarding legal claims.  The Court cannot consider legal conclusions but may consider facts.  Nevertheless, Plaintiffs add that threatening Canfield's father and Gregg's job are also extreme and outrageous.  ECF No. 19 at 20.  Canfield's father's letter from Ken Jones states that he should "walk away."  ECF No. 45 at 8.

While these actions may be unfair or inappropriate, they do not rise to the level of extreme and outrageous behavior.  *Snyder*, 98 Wash. App. at 321–22 (stating "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not enough) (quoting *Grimsby,* 85 Wash. 2d at 59).

1    For example, in *Kloepfel v. Bokor*, 149 Wash. 2d 192, 194 (2003), Kloepfel

2    sued Bokor for IIED because he violated his no contact order, called her home

3    phone 640 times, work phone 100 times, and threatened to kill her.  As a result, the

4    Court found "[n]o rational person could endure the constant harassment suffered

5    by Kloepfel without suffering severe emotional distress*." Kloepfel v. Bokor*, 149

6    Wash. 2d 192, 202 (2003).

7    In *Haubry v. Snow*, 106 Wash. App. 666, 672; 680-81 (2001), the court

8    found similar when Haubry alleged that Dr. Snow touched her inappropriately

9    during her employment with him.  For example, he inappropriately commented on

10    her outfits, rubbed her legs and thighs multiple times, and placed his body against

11    hers among many other unwanted advances.  *Haubry v. Snow*, 106 Wash. App.

12    666, 672 (2001).

13    In *Synder*, the Court did not find sufficient facts for IIED when "Ms. Hall

14    insulted, threatened, annoyed, showed unkindness, and acted with a callous lack of

15    consideration."  *Snyder*, 98 Wash. App. at 322.

16    For the initial determination, these facts do not show that reasonable minds

17    could differ on whether the conduct was extreme and outrageous.  Therefore,

18    summary judgment is proper.

19    **B. Intent**

20    Plaintiffs alleges that Defendants the Sheriff and Undersheriff intended or

1  recklessly "was designed to[] and did inflict severe emotional distress."  ECF No.

2  49 at 20.  Plaintiffs cite the August 11th meeting, and the alleged threat to

3  Canfield's father and Gregg's job.  *Id.*

4       Plaintiff does not allege facts to support that reasonable minds could differ

5  on whether Defendants had intent or knew to a substantial certainty that severe

6  emotional distress would occur.  It may be true that Defendants likely knew to a

7  substantial certainty that the meetings and requests to stop talking about the

8  allegations with letters and out-of-work meetings where Canfield is required to

9  speak on a sensitive matter against superiors in front of other employees could lead

10  to emotional distress for Plaintiff Canfield.  ECF No. 52 at 19-20.  However,

11  whether they knew it would lead to severe emotional distress is unlikely.  *See*

12  *Snyder*, 98 Wash. App. at 321–22.

13       For similar reasons, stating Gregg can be replaced is not sufficient to support

14  reasonable minds could differ on Defendants recognizing to a substantial certainty

15  that severe emotional distress would occur for Gregg.  ECF No. 43 at 18.

16  Therefore, Plaintiffs did not provide sufficient facts where reasonable minds could

17  differ to survive summary judgment.

18  **C. Severe Emotional Distress**

19       Emotional distress alone may include "all highly unpleasant mental

20  reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger,

1  chagrin, disappointment, worry, and nausea." *Kloepfel v. Bokor*, 149 Wash. 2d

2  192, 203 (2003) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1965) CMT. J

3  (A.L.I. 1965)).  Severe emotional distress must not be "transient and trivial" but

4  instead a level of distress "that no reasonable man could be expected to endure it."

5  *Kloepfel v. Bokor,* 149 Wash. 2d 192, 203 (2003) (quoting *Id.*).

6         Plaintiffs support claims of severe emotional distress by citing August 11,

7  2021, Canfield's father, and Gregg's distress confirmed by former Undersheriff

8  Dave Ponozoo.  ECF No. 49 at 21.  Canfield's father states that Canfield was upset

9  by the letter he received and that he did not recognize Canfield as the same person

10  since resignation.  ECF No. 45 at 9.  Gregg states that he was "devasted because

11  [he] knew [he] had to resign."  ECF No. 43 at 19.

12         Plaintiffs did not allege facts of sufficient severe emotional distress where

13  reasonable minds would differ.  For example, in *Kloepfel*, she experienced

14  "nervousness, sleeplessness, hyper-vigilance, and stomach upset".  *Kloepfel v.*

15  *Bokor*, 149 Wash. 2d 192, 194-95 (2003).  The numerous phone calls "disturbed

16  her privacy" and Bokor's conduct "made it impossible for her to carry on a normal

17  dating relationship."  *Kloepfel*, 149 Wash. 2d at 194-95.  Furthermore, the fact

18  there was sufficient evidence for outrageous and extreme conduct made this

19  finding easier.  *Id.* at 202 (citing *Carmody v. Trianon Co.,* 7 Wash. 2d 226, 235

20  (1941)) (stating that when the plaintiff received such a beating, that anyone would

suffer insult and humiliation).  Even more, while it is not dispositive, allegations do not show ongoing distress or severity where Plaintiffs sought professional aid. *Zink v. City of Mesa*, 17 Wash. App. 2d 701, 715 (2021) (stating the plaintiff's claim for IIED failed because it did not show ongoing distress or that it led to the plaintiff seeking any form of professional support).  As a result, summary judgment is proper.

Plaintiffs allege the emotional distress they faced led them to leave their law enforcement careers.  ECF No. 49 at 21.  However, as the Washington Appellate Court, Division Two stated, "[n]or do threats to terminate or to suspend constitute outrageous conduct in light of *Dicomes,* where not even actual termination constituted outrageous conduct."  *Kirby v. City of Tacoma*, 124 Wash. App. 454, 474 (2004).  Even if this was sufficient, Plaintiffs did not allege sufficient facts for outrageous and extreme behavior to survive summary judgment.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.  Defendants' Motion for Summary Judgment (ECF No. 37) is **GRANTED in part.**

    a.  Plaintiffs' claim of Intentional Infliction of Emotional Distress, 42 U.S.C. § 1983 claim against Defendant Grant County, and Plaintiff Gregg's claim of First Amendment Violation under 42 U.S.C. § 1983 are **DIMMISSED with prejudice.**

        i.  Plaintiff Canfield may not base his 42 U.S.C. § 1983 claim on a theory of constructive discharge as an adverse employment action or his First Amendment violation under a theory of compelled silence/speech.

    b.  Plaintiffs' claims for Wrongful Termination in Violation of Public Policy and Plaintiff Canfield's claim of First Amendment Violation under 42 U.S.C. § 1983 against Defendants Rectenwald and Jones remain.

2.  Plaintiffs' Motion to Supplement Authorities (ECF No. 50) is **GRANTED in part.**

    The District Court Executive is directed to enter this Order and furnish copies to counsel.

    DATED January 26, 2026.



                       THOMAS O. RICE
               United States District Judge